(C.D. 2075)

GENERAL TWINE CORP. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 13, 1959)

*Sharretts, Paley & Carter* (*Howard Clare Carter* and *Richard F. Weeks* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the defendant.

*Lamb & Lerch* (*David A. Golden* of counsel) as *amicus curiae*.

Before LAWRENCE, RAO and FORD, Judges; FORD, J., dissenting

RAO, Judge: The two protests, which have here been consolidated for the purposes of trial, raise the question of the dutiable status of certain imported merchandise invoiced as either "Straight jute packing 'F. St.,' untarred," or as "dry jute packing 'S,' or 'F. St.'." The collector of customs at the port of entry classified this merchandise as jute twist, twine, or cordage, composed of two or more jute yarns or rovings twisted together, the size of the single yarn or roving of which is coarser than twenty-pound, and, accordingly, assessed duty thereon at the rate of 3½ cents per pound, as provided for in paragraph 1003 of the Tariff Act of 1930.

It is the claim of plaintiff that this merchandise is oakum, which is entitled to free entry by reason of the provision therefor in paragraph 1729 of said act.

Said paragraph 1003 provides in its entirety as follows, the particular portion having relevance herein being italicized:

Jute yarns or roving, single, coarser in size than twenty-pound, 2½ cents per pound; twenty-pound up to but not including ten-pound, 4 cents per pound; ten-pound up to but not including five-pound, 5½ cents per pound; five-pound and finer, 7 cents per pound, but not more than 40 per centum ad valorem; jute sliver, 1½ cents per pound; *twist, twine, and cordage, composed of two or more jute yarns or rovings twisted together, the size of the single yarn or roving of which*

*is coarser than twenty-pound,* 3½ cents per pound; twenty-pound up to but not including ten-pound, 5 cents per pound; ten-pound up to but not including five-pound, 6½ cents per pound; five-pound and finer, 9 cents per pound; and in addition thereto, on any of the foregoing twist, twine, and cordage, when bleached, dyed, or otherwise treated, 2 cents per pound.

Paragraph 1729, *supra,* provides simply "Oakum."

In urging that the instant merchandise falls within the tariff designation for "oakum," plaintiff makes no concession, tacit or expressed, that twisted jute packing is otherwise alternatively, but less specifically, provided for within the scope of paragraph 1003, *supra.* On the contrary, the argument is made, and vigorously advanced, that twisted jute packing is not twist, twine, or cordage, in any sense of those words, and, therefore, that the collector erred in invoking the provisions of said paragraph for the classification of the instant merchandise. It is further contended that oakum is, in contemplation of law, an *eo nomine* designation implying use, and that the use of the imported product is identical to that of other forms of oakum.

Counsel for the Government and *amicus curiae* adopt the opposite view, asserting not only that twisted jute packing is not oakum, but that it is clearly and squarely encompassed by the "twist, twine, and cordage" portion of said paragraph 1003.

Anent these contrasting positions, certain preliminary observations seem indicated. It is, of course, fundamental that a plaintiff in a protest action assumes a twofold burden. He is required to establish that the collector's classification was erroneous and that the imported merchandise is properly dutiable as claimed. *United States* v. *Gardel Industries,* 33 C.C.P.A. (Customs) 118, C.A.D. 325. The obligation to upset the collector's classification derives from the fact that it is presumptively correct, and stands, until at least *prima facie* rebutted. *United States* v. *G. Klein & Son,* 42 C.C.P.A. (Customs) 73, C.A.D. 574.

Accordingly, it was indeed incumbent upon this plaintiff to address its proof to the issue of whether or not twisted jute packing is twist, twine, or cordage, or less specifically so provided for than as oakum, as well as to the issue of establishing affirmatively that it is oakum. And, since no other tariff provision is invoked by plaintiff, a failure to show that twisted jute packing falls within the provision for oakum renders irrelevant to the outcome of *this* case any consideration of whether the collector may have erred in classifying it as twist, twine, or cordage. However, it requires little, if any, elaboration to sustain the proposition that oakum is a more specific designation than twist, twine, or cordage, in the condition described by paragraph 1003, *supra,* and if the imported product were shown to respond to the call of both provisions, it seems clear that it ought to be classified as oakum.

In support of their respective contentions, as hereinabove outlined, the parties to this action introduced the testimony of seven witnesses, three for the plaintiff, four for the defendant, together with many physical and documentary exhibits. With the exception of plaintiff's witness, Jack Knapp, a licensed plumber for the State of Texas, whose testimony was confined to the use of oakum and packing for calking purposes, all of the witnesses were well versed on the subject of the imported and related jute products, having had extensive experience with the manufacture and/or sale of the same for many years.

The record establishes, without serious conflict, that the imported merchandise, a sample of which is in evidence as plaintiff's exhibit 1, is generally adverted to by the trades which produce and consume it as twisted jute packing, which is sold either dry, as is the case with the merchandise at bar, tarred, or oiled. In its imported condition, it consists of 12 strands, each slightly twisted, and then jointly twisted into the form of a loose rope. However, plaintiff's proof is directed toward the proposition that there is no difference between oakum and packing, and that twisted jute packing is sometimes referred to as rope oakum.

On the other hand, all of defendant's witnesses were of the confirmed opinion that oakum and packing are distinctly different products, not commercially interchangeable, nor adapted for precisely the same uses. It is to be noted, however, that at least one of the companies to which their testimony relates advertised the product as "Twisted jute packing or rope oakum." (Plaintiff's collective exhibit 16, pricelists of the Dixie Jute Bagging Corp.)

Plaintiff's witness, Daniel Kelminson, is the president of Jacob Holm & Sons, Inc., a corporation with which plaintiff was merged in 1955. It is engaged in the purchase and sale of twines, ropes, cordage, packing, and oakum. From 1932 until the present, the entire business of this witness has been the purchase and sale of all types of twines, cordage, ropes, oakum, packing, and similar products made from fibers of jute, cotton, sisal, manila, flax, synthetics, and wire.

Although this witness had never personally manufactured any of these products, he was familiar with manufacturing procedures and, particularly, with the method employed by his company's Danish mills for the production of the merchandise at bar, which is imported in 50-pound coils, approximately 2,900 feet in length.

Kelminson testified that the raw materials for plaintiff's exhibit 1 are jute cuttings, which are run through the following machines: A bale opener, a softener, a breaker card, a finisher card, a first drawing machine, a slubber, and a machine for forming the many-end coil.

If the product is to be oiled or tarred, other processes ensue; but the merchandise at bar was dry jute packing, put up in 12 strands. The slubber is used to impart a slight twist to the material which comes from the drawing machine in the form of a sliver or continuous ribbon of combed jute with relatively parallel fibers.

This witness was of opinion that each of the individual stands in plaintiff's exhibit 1, as represented by plaintiff's exhibit 1-A, a single strand taken therefrom, would be called a sliver, notwithstanding that each of the strands is somewhat twisted. He contrasted plaintiff's exhibit 1-A with what he considered a roving, such as plaintiff's exhibit 2, in that a roving is made from long jute fibers which go over the following machines: A bale opener, a spreader, a hackling machine, a breaker card, a finisher card, the first drawing frame, the second drawing frame, the third drawing frame, and a roving frame or gill spinner. The drawing frames reduce the sliver in size. The roving frame or gill spinner twists the sliver. He further stated that the sliver is the first process in the manufacture of a roving or a yarn, but, before the sliver becomes a roving, the additional processes above enumerated are required. In the formation of a yarn from a roving, a fine spinning frame, which further reduces the size and twists the rove, is used.

Kelminson produced four samples of what he considered to be twist and twine, which were received in evidence, plaintiff's exhibit 3 being identified as a twist; plaintiff's exhibits 4, 5, 6, and 7, as twines of various sizes. It was his opinion that exhibits 4, 5, 6, and 7 were fairly representative of commercial grades of jute twine composed of two or more jute yarns or rovings twisted together, the size of each single yarn or roving of which is coarser than 20-pound, although he agreed that there are many other articles that would fit that definition; and that commercial twine is not ordinarily composed of single yarns weighing more than 135 pounds for the standard length of 14,400 yards. By comparison, he stated exhibit 1-A is about a 750-pound yarn. He further testified that exhibits 3 through 7 are used principally for tying packages and also for sewing burlap bags, in some forms of weaving and braiding, and as a filler or center for steel wire cable.

With respect to the imported product, Kelminson stated that, during the course of the years since 1934, he has sold several million pounds of that material, which has been referred to, both by himself and his customers, either as oakum or as packing. It was his opinion that the term "oakum" is a broad one which encompasses all similar materials used for calking pipes, joints, buildings, and ships. It is not confined to untwisted, loose, or spun materials, but includes "spun and unspun and jute packing, tarred, oiled, dry, sterilized, and square-braided

jute packing." It is twisted into 10 or 11 strands for convenience of use and is also used in the single strand like exhibit 1–A.

Based upon his observation of the manufacturing processes involved in the production of plaintiff's exhibit 1, the witness believed that merchandise like it would not be suitable for use for further manufacture into ropes or for weaving, in view of the "quality of the jute used, the size of the strand, the construction of the strand, and the general put-up in which it presently is or way it was imported, Exhibit 1." Nor would twist, twine, or cordage, on the one hand, and oakum, on the other, be mutually suitable for each other's end uses. By virtue of the raw materials employed, the simple processing, and the finished form, oakum is comparatively cheaper than twists, twine, or cordage. It has less strength and can not be used for tying packages, weaving or braiding, or sewing. It is also fluffier, which is a factor in its function as a calking material. "In order to fill up a joint in a pipe or a crevice in a deck or building naturally the fluffier or the softer the material is the easier it will be inserted into the joint. And secondly, it will hold the compound or lead that is poured over it in order to keep the opening sealed or jointed."

On cross-examination, this witness insisted that a sliver does not become a roving until it is put over the roving frame and that a yarn is a finer size than a roving. He would not consider exhibit 1–A to be anything other than a sliver, regardless of the fact that there is some twist in it, for the reason that it had not been processed over a roving frame. Neither would he call the multiple-twisted product that is exhibit 1 a twist. At most, he would term it a jute that has been twisted. Furthermore, he would not use the fibers of exhibit 1 to make twine.

Plaintiff's second witness, Fred L. Schoenfeld, has, during the course of his business life, been engaged in both the manufacturing and selling phases of the general line of cordage items, although his manufacturing experience has been confined to the period between 1927 and 1937. He has also produced and sold both oakum and packing. He stated that, during the time he was employed by the American Manufacturing Co. in its Brooklyn mill, the oakum department always referred to material like exhibit 1 as rope oakum. It was usually produced from a low grade of fibers, including waste material, such as old jute bagging of the kind represented by plaintiff's exhibit 9, which is composed of a low-grade twisted yarn. Generally speaking, the processes of manufacture which he described coincided with those set forth by the previous witness. He indicated that the number of carding machines employed depended upon the quality of the fibers, and, although he preferred a one-card system, there have been cases where four cards have been used. If the sliver which comes off the

carding machine is not sufficiently uniform, it is put on a drawing frame, the operation of which consists of a doubling and a drawing out. The resulting sliver, which is delivered into a can, "we now called 'oakum,' not raw material any more, * * * there were hundreds of people working that called this 'oakum,' after it was delivered either from the card or the first drawing frame." Thereafter—

In order to be able to ship it out, handle it further, and not disturb the endless sliver, we put it on the slubbing machine or the twister and added just a few turns of twist to it, although we realize if we over-twisted it it would harm the operation in the field for which oakum was used. So we added only just enough twist to hold it together.

Schoenfeld was likewise of opinion that exhibit 1–A differs from exhibit 2, the roving, in size, in the fact that the roving has more twist, is made of finer yarns, and is the result of at least two more operations, to wit, a drawing frame and the roving frame itself, which is "for all practical purposes, another drawing frame with the spinning flier added to it." He stated that he would never have called exhibit 1–A a yarn, which he defined as an endless product of jute fibers that has uniformity and can be expressed by a number or a size either in diameter or in feet per pound. It is produced from a roving which is fed into a finishing or spinning frame. And when a yarn is twisted into 2, 3, or 4 ply, it becomes a commercial twine for tying purposes, as illustrated by a sample prepared by him and introduced into evidence as plaintiff's exhibit 10, showing a 3-ply 72-pound tube rope, a single yarn used in making the rope, and a single yarn which had been untwisted to form a heavy sliver.

This witness also stated that he never sold any jute twine that was heavier than 4-ply 135-pound, whereas exhibit 1–A weighs 744 pounds; and that jute twine is used in the carpet industry, for tying agricultural products and other articles, for the manufacture of filler cord, wire rope, cord, and for the braiding of various articles. He estimated that he had sold some 200,000 pounds of merchandise like exhibit 1, most of which was oiled or tarred, which was called oakum and packing; more precisely, in the rope form, consisting of from 9 to 12 strands, it was called rope oakum. In the single strand form, similar to exhibit 1–A, it was sold either tarred, untarred, or oiled, in a 5-pound box. In the loose fiber form, it was sold in a 50-pound bale and was called spun oakum. Regardless of form, it is used for calking or packing openings, crevices, and spaces between different materials that have to be joined together, in soil pipes, concrete pipes, air-conditioning units, on boats, in windows.

Schoenfeld was of opinion that jute twine or cordage would not be suitable for such uses, because it has lost the identity and fluffiness of the fiber. Moreover, in view of the fact that six to eight additional operations are required to produce twine, it is automatically more

expensive than oakum. Neither did he think that exhibit 1 was suitable for use for any twine or cordage purposes, because it has no strength and is too bulky.

On cross-examination, this witness testified that, owing to the additional manufacturing processes, jute twine should cost anywhere from 5 to 10 cents a pound more, but whether it actually does, due to competitive conditions, he would not know. Further, he indicated that the single yarn in exhibit 10 was not the same as the single strand which is exhibit 1–A. The former is more advanced and has a larger number of turns per inch. So, too, were the yarns contained in the old jute bagging, which is exhibit 9. He also insisted that the slight twisting of exhibit 1–A did not make it a roving. It was still a sliver. To make it a roving, it would need further drawing out on one or more drawing frames and at least 10 times more twist on a twisting frame, although it might be possible, if a large-sized roving were desired, to eliminate the drawing out. To make a roving into a yarn requires additional drawing out and tighter twisting. He stated that the purpose of drawing out was to make the strand more uniform and thinner. In the condition as imported, he would term plaintiff's exhibit 1–A a multiple put-up of sliver.

Schoenfeld admitted that there were other materials that could be used for calking or packing besides oakum. These included lead, putty, rags, and tar. He further stated that when oakum was ordered he would inquire whether it was desired in the loose, single strand, or rope form, and that, although he did not sell the loose form bone dry, he sold the other forms dry, oiled, or tarred.

Jack Knapp, who also testified for the plaintiff, is a licensed plumber who has used approximately 1,000 pounds of material like exhibit 1 in its imported condition. He has also used several thousand pounds of packing which has been oiled or tarred. The dry material, which he calls dry oakum, is used to calk water mains together, to eliminate the taste in water. It is packed tightly into the joints, and hot lead is poured over it. In the tarred or oiled state, it is used for calking soil pipes, drainage vents, in windows, boats, air-conditioning units, machinery, and the like. In his opinion, the dry material would probably last forever in a water main, but in a waste line, where there are sewer gases, it would probably rot.

This witness had never used material such as exhibits 2, 3, 4, 5, 6, or 7 for calking and did not believe it would be suitable for such purposes. It is too fine and hard and would not pack tightly or stay in long enough. Also, the calking iron would cut it in two.

For the defendant, Harold Pate, assistant secretary and manager of the St. Louis Cordage Mills, the western factory plant of American Manufacturing Co., Inc., was the first witness to testify. He has been

connected with the processing and sale of all jute products since 1925 and is thoroughly familiar with the manufacture of jute packing and oakum. During the period since 1925, his company has sold well over a billion pounds of oakum and twisted jute packing. He stated that the two are completely different and are manufactured differently. He characterized oakum as a mass of loose fibers that have been tarred; twisted jute packing as a rove or rope consisting of several roves or twists. Pate stated that oakum is never sold by his company in dry form; it is always tarred; the two products have different pricelist descriptions, as indicated by defendant's illustrative exhibit D; are invoiced and billed differently, as shown in defendant's collective exhibit E; and an order for one would not be filled by supplying the other. It also appears that twisted jute packing and *marine* oakum have separate Federal specifications (plaintiff's exhibit 14; defendant's exhibit Q).

With the aid of several photographs, received in evidence as defendant's illustrative exhibits A–1 and A–2, B–1 and B–2, this witness described the respective manufacturing steps as follows:

* * * Oakum is the simplest product that any person in the textile field has to make. It consists of simply picking and carding the fibers into a loose sliver form and impregnating them with tar. Oakum is always tarred. That's not much of an operation to get to that point. The only final step is in packaging. It's generally put up in a 50-pound bale. [Oakum is also sold in 5-pound bales. A miniature replica of a bale of oakum is in evidence as defendant's illustrative exhibit A. Also, defendant's illustrative exhibit F is tarred oakum composed of a sliver.]

        *       *       *       *       *       *       *
Continuing with how we make oakum, the raw materials go through a picker which serves the double purpose of opening up the fibers and some mixing together of fibers and then into the carding operation which is essentially a combing process for the purpose of blending the fibers, and arranging them in a reasonably parallel shape and into a fairly uniform thickness. In making oakum the fiber is delivered out of the card in the form of sliver, usually, and a sliver is just a loose mass of fiber in a ribbon form. * * *

        *       *       *       *       *       *       *
The following step after the sliver is delivered from the carding is to impregnate it with tar. We in the same operation deliver the tarred slivers into a press box so that we may then compress them into a 50-pound shipping bale.

In the manufacture of twisted jute packing:

* * * The picking and carding of the raw material is identical except that we usually add additional cardings for the purpose of developing an even more uniform sliver being delivered from the card than would be necessary in oakum. The sliver is then twisted on a machine built for that purpose [in the case of his company, a Haskell-Daws former is used] into a roving or twist. Following that that roving or twist is combined—several of them are combined, from seven to twelve may be combined together on a machine which the industry calls a former. In our case we use a Watson former. In the same process of combining these twists or rovings into the finished twisted jute packing we, if

the customer requires it, apply various treatments. Sometimes the resulting product there, the twisted jute packing, may either by dry or it may be tarred or may be oiled. * * *

A sample of the company's better grade of dry jute packing was received in evidence as defendant's illustrative exhibit C. This is only sold dry, but it appears that the company also manufactures a cheaper grade, which is sold dry, tarred, or oiled. Pate stated that twisted jute packing is usually packaged in 50-pound coils, but it is also supplied in 100-pound coils, 25-pound coils, 5-pound bales, 27-inch cut lengths in a 5-pound box, and 27-inch cut lengths in a 50-pound carton, bulk. It was his opinion that the twisting of the strands is not performed for the purpose of putting packing in a salable condition.

This witness defined a roving as the result of putting twist into a sliver. He further stated that his company produces rovings in weights in the neighborhood of 700 or 800 pounds for material like exhibit C, which consists of several rovings twisted together; and also 300-pound rovings for use by the electrical cable industry.

On cross-examination, Pate reiterated that all that is necessary to convert a sliver into a roving is to give it some twist; and that a roving is not necessarily the product of a roving frame or gill spinning frame. He admitted, however, if one were desirous of producing something as small in size as plaintiff's exhibit 2, it would be more economical to perform the final operation of twisting on a roving frame rather than on a former. Otherwise, he stated that the processes of carding and drawing were substantially the same for exhibits 2 and C. He further stated that the term "roving" has the same meaning whether used in the twine or cordage industry or in the packing and oakum industry; and a 300-pound electrical roving could be made on the same machinery as produced defendant's illustrative exhibit C. The witness agreed that the two industries are separate; operate under different zone pricing systems; and that the twine and cordage industry does not consume jute packing. Nevertheless, he insisted that exhibit C is a rope, which he defined as several yarns twisted into a strand and a multiple of strands twisted into a rope. He further stated that packing and oakum are purchased by the plumbing trade, principally, but in the form of exhibit C, that is, dry-twisted jute packing, it is purchased by the municipal contractor and generally used exclusively for water mains. "How can I put this in a simple way—Exhibit A and Exhibit F are definitely not interchangeable with Exhibit C nor with Exhibit 1. The material covered by Exhibits A and F may be used for plugging up openings in many things from pipes to chinking log cabins. The material of Exhibit C to my knowledge is used exclusively in calking water mains."

Pate defined marine oakum as new material, composed of an entirely different fiber from plumbers' oakum, and the words "unspun

oakum" as the carded fiber that has not been put into a sliver, but remains a mass of loose fibers.

It appears further from the testimony of this witness that, in the years since 1925, the proportion of his company's production of oakum, as compared with jute packing, has decreased from 25 percent versus 75 percent to 14½ percent versus 85½ percent, and that if a customer ordered rope oakum, and about 5 percent of them do, an inquiry would be made to ascertain what product he desired, as, in his opinion, exhibit C is absolutely not rope oakum.

Further examination of this witness disclosed his opinion that practically any fibrous material, as well as cement, tar, and putty, could be used for calking purposes. It was his personal view that once the calking of the joint is accomplished by the application of hot lead, the calking material serves no function whatsoever.

Defendant's other witnesses, John S. Jenkins, treasurer and general manager of Dixie Jute Bagging Corp., with over 40 years' experience in the jute trade, E. D. Martin, president and general manager of the Hooven & Allison Co., with 50 years' experience, and Warren R. Miller, superintendent of the jute packing department of Thomas Jackson Son Co., with 20 years' experience, gave evidence tending in the main to be cumulative and corroborative of the testimony of the witness Pate. Similar manufacturing processes for oakum and twisted jute packing were described; similar opinions were expressed to the effect that the two are different products, manufactured differently, have different uses and applications, and are differently designated, packaged, and priced. They also agreed that plumbers' oakum is always sold tarred and is never twisted; that twisted jute packing, as its name implies, is always twisted, and may be either dry, tarred, or oiled; that orders for rope oakum would not be filled by supplying twisted jute packing, unless an inquiry were first made; that a sliver becomes a roving when twisted, however slight the twist may be, and that exhibit 1 is a twist or roving.

Variations in the individual testimony of these three witnesses also brought to light the following evidence:

From the testimony of the witness Jenkins, it appears that the yarns in the cotton bagging, which is plaintiff's exhibit 9, are made on the same machines used for producing twisted jute packing. "We twist this on a slubber with no roving frames, no drawing frame. It's twisted on a slubber and made into what Mr. Schoenfeld said was a yarn, twisted yarn, and so it is."

Jenkins' company, the Dixie Jute Bagging Corp., issued pricelists, effective July 28, 1948, and October 1, 1950, in evidence as plaintiff's collective exhibit 16, wherein the terms "twisted jute packing" and

"rope oakum" are synonymously employed, and the following statements are made:

### PLUMBERS' SPUN OAKUM

Many plumbers prefer to use the bale tarred jute fiber in bulk rather than twisted in rope form. DIXIE PLUMBERS' SPUN OAKUM is put up in standard fifty-pound bales as illustrated.

\*      \*      \*      \*      \*      \*      \*

### DIXIE BUILDERS' OAKUM

For those who wish a dry fiber for caulking woodwork, windows, and general purposes, we offer a loose, clean, dry jute filler—odorless and stainless. This is packed in bulk bales of thirty to fifty pounds each.

Concerning these pricelists, which were stated to be obsolete, Jenkins admitted that, in some areas, the terms "twisted jute packing" and "rope oakum" are interchanged.

Witness Martin was of opinion that the sliver which is spun oakum would become twisted jute packing if as little as one twist per foot were imparted to it; and that the decrease in the use of oakum over the years since 1920 has been occasioned by the greater convenience of using twisted jute packing for calking purposes. He also testified that marine oakum is made of a different material from plumbers' oakum, is similarly tarred, but to a different degree, and in his mill is subjected to an additional process, to wit, the drawing frame.

And, finally, witness Miller stated that although oakum is generally tarred, his company makes a builders' oakum in sliver form, flat and without twist, which is dry.

In considering the sharp divergence in nomenclature which the instant record reveals as between plaintiff's proof and that of defendant, and the fact that the record is replete with reference to trade terminology, it must be borne in mind that no issue of commercial designation has been raised. Under the settled precept that tariff acts are drafted in the language of commerce, which, in the absence of an established commercial designation, is presumptively that in common use, common meaning must control. *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T.D. 25436. And while the opinions of witnesses versed in the manufacture, use, and trade descriptions are relevant, they are advisory only. They may be considered as an aid to the court in ascertaining common meaning, but are not necessarily determinative thereof. Common meaning is a matter solely within the province of the court to declare, and any relevant authority as may refresh the court's recollection of that meaning may properly be consulted. *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 C.C.P.A. (Customs) 24, C.A.D. 209.

In the view that we have already taken, that oakum is a more specific provision than twist, twine, or cordage, we address ourselves first to a consideration of the meaning of that word.

Standard dictionaries define "oakum" in the following terms:

Loose fiber obtained by untwisting and picking old hemp ropes. [Webster's New International Dictionary, 2d ed. unabridged, 1956.]

Hemp-fiber obtained by untwisting and picking out loosely the yarns of old tarred hemp rope; used in calking ships' seams, etc., sometimes also in dressing wounds. [Funk & Wagnalls New Standard Dictionary.]

Tow; also, loose fiber obtained by untwisting and picking apart old ropes, used for calking the seams of ships, etc. [The New Century Dictionary of the English Language.]

It seems clear from the evidence in this case that oakum as a commercial product is something more than the loose fiber obtained from picking old hemp ropes, referred to in these definitions, and which has been characterized in this record as unspun oakum. As sold in the markets of this country, the variety of oakum known as plumbers' oakum is often made from jute cuttings, jute butts, and old waste bagging, as well as from other jute wastes, and is known as spun oakum. Other admitted varieties of oakum, such as marine oakum and builders' oakum, are also now machine processed and may or may not be made from hemp. That the broader definition was in the contemplation of Congress in the enactment of paragraph 1729, *supra*, is indicated by the following statement as to the description and uses of oakum presented to Congress in the 1929 Summary of Tariff Information, in connection with the enactment of the Tariff Act of 1930:

Oakum, a tarred preparation of soft fibers, is classified according to its chief uses into marine oakum and plumbers' oakum. Marine oakum, used for calking and packing joints or timbers of wooden vessels, and deck planking in ships, is usually made of old tarred ropes, although since 1914 domestic hemp tow has been used in its manufacture. Plumbers' oakum, used for calking all kinds of pipes, is made from jute, jute butts, and jute wastes, principally old waste bagging.

Also illuminating, although not suggestive of congressional intent as to the scope of the term in question, is the following comment on oakum in the 1948 Summaries of Tariff Information:

Oakum is a preparation of soft vegetable fibers, generally impregnated with tar. Marine oakum is used in shipbuilding for calking or packing joints of timbers in wooden vessels and the deck planking of wooden or iron ships. Plumbers' oakum is used for calking all kinds of pipe joints and for packing in steel and concrete buildings. Formerly made by hand from old tarred hemp rope, oakum is now almost entirely factory produced. Marine oakum is of better quality than plumbers' oakum and it made from new hemp or sunn fiber. Plumbers' oakum is made from hemp tow, old hemp rope, jute fiber and waste, and carded jute bagging. Oakum is sold either in loose form or made into sliver or twisted strands for convenience in calking.

From the foregoing, we are inclined to the view that oakum is a material which assuredly is not characterized solely by reason of its physical state, structure, and composition. It may be, and in the case of recognized marine oakum is, a product of hemp or sunn fiber, or as, in the case of what is admittedly plumbers' oakum, a product of jute. It may be in the form of separated fiber, or in the form of a sliver resulting from one or more processes of carding the raw material, and concededly may be, and sometimes is, put through the operations of a drawing frame.

In conflict with the testimony of the witnesses for the defendant to the effect that the article they consider to be oakum is always sold in a tarred condition, we note that there is a recognized form of oakum, known as builders' oakum, which is sold dry. Although builders' oakum occupies a relatively insignificant quantitative status, as compared with other types of oakum, it is, nevertheless, a commodity which is still being marketed. Moreover, and since it is not disputed that oakum is used for calking purposes, there is the added fact that the dictionaries, in defining the verb "calk," make reference to the use of *"tarred oakum"* [italics supplied] an unnecessary qualification of the word, if there is no other kind.

If the physical condition alone does not answer the question of what is oakum, what then may be regarded as finally determinative? In the recent case of *United States* v. *Quon Quon Company*, 46 C.C.P.A. (Customs) 70, C.A.D. 699, our appellate court expressed the view that use is an important consideration in determining the scope of a designation by name, stating in part:

* * * We are not so trusting of our own notions of what things are as to be willing to ignore the purpose for which they were designed and made and the use to which they were actually put. Of all things most likely to help in the determination of the identity of a manufactured article, beyond the appearance factors of size, shape, construction and the like, use is of paramount importance. To hold otherwise would logically require the trial court to rule out evidence of what things actually are every time the collector thinks an article, as he sees it, is specifically named in the tariff act.

There can be little doubt from the instant record that both plumbers' oakum and twisted jute packing subserve the same ultimate purposes. They are both used as calking materials. The evidence on the part of the defendant that the two articles have different applications is not convincing. The difference, if any may be said to exist, lies in the fact that the dry preparation is more suitable for water mains, for the reason that it will not impart a taste to the water. But in the tarred or oiled states, the uses appear to be identical. Whether in the sliver, single-twisted strand, or multiple-twist put-up, this material is chiefly used to fill a joint in a pipe or a crevice in a deck or building

to contain the compound which seals them. And apparently that form is used which suits the individual preference of the user.

Furthermore, twisted jute packing possesses the characteristic fluffiness which adapts it to such use. In some areas of the country, it is referred to as rope oakum, and, indeed, at least one domestic manufacturer so termed it in pricelists, effective prior to the instant importation. It is also significant that, in the course of the years since the 1920's, the production of plumbers' oakum has diminished as twisted jute packing has gained wider acceptance. Although defendant's principal witness denied that the twisted individual strands and the rope forms are merely more salable varieties than the sliver form, no other plausible explanation has been advanced for the further processing of the sliver into an article nevertheless adapted to the same uses.

Based upon this record and the authorities to which we have heretofore alluded, we are persuaded to the view that the provision for oakum in paragraph 1729, *supra*, includes twisted jute packing, and that, therefore, the merchandise at bar is entitled to free entry, as therein provided.

In passing, we deem it pertinent to observe that, although this decision rests upon the basic proposition that oakum is a more specific provision than twist, twine, and cordage, and to be preferred in the classification of the instant merchandise, we believe the weight of the evidence establishes that the loosely twisted ropelike product which is the subject merchandise is not, in any event, twist, twine, or cordage, within the contemplation of paragraph 1003, *supra*.

The claim of the plaintiff that twisted jute packing is entitled to free entry as oakum, pursuant to paragraph 1729 of the Tariff Act of 1930 is sustained.

Judgment will be entered accordingly.

### DISSENTING OPINION

Ford, Judge: The question presented to the court in this matter is whether certain merchandise which is conceded to be an article known as jute packing is within the common meaning of the *eo nomine* provision in paragraph 1729 of the Tariff Act of 1930 for oakum.

Based upon the record in this case, I am unable to agree with my associates that the imported product falls within this term. There has been no attempt upon either party to establish a commercial designation of the term "oakum." Accordingly, the common meaning of the term "oakum" is controlling. It is well-settled law that the court may resort to dictionary definitions of the term as an aid.

Webster's New International Dictionary of the English Language (unabridged 1929) gives the following definition:

oakum (ō'kŭm), *n.* [AS. *ācumba;* ā-(cf. A-,2)+*cemban* to comb, *cámb* comb. See COMB.] * * *

2. The material obtained by untwisting and picking into loose fiber old hemp ropes. It is used for calking the seams of ships, stopping leaks, etc.

From the foregoing, it is apparent that the very derivation of the word "oakum" from the Anglo Saxon word *acumba* is contrary to the state of the product known as jute packing. The word *acumba* means to comb out; hence, it is a process of straightening, whereas the jute packing involved herein is twisted.

While dictionary definitions may be resorted to for the assistance of the court, the basic duty of the court is to determine the legislative intent in enacting the provision involved. It would appear that a provision has been made for oakum since at least the Tariff Act of 1883.

The Summary of Tariff Information, 1929, at page 2466, describes oakum as follows:

Oakum, a tarred preparation of soft fibers, is classified according to its chief uses into marine oakum and plumbers' oakum. Marine oakum, used for calking and packing joints or timbers of wooden vessels, and deck planking in ships, is usually made of old tarred ropes, although since 1914 domestic hemp tow has been used in its manufacture. Plumbers' oakum, used for calking all kinds of pipes, is made from jute, jute butts, and jute wastes, principally old waste bagging.

The meaning at the time of the enactment of the tariff act is, of course, controlling herein. *United States* v. *Belgam Corp. et al.*, 22 C.C.P.A. (Customs) 402, T.D. 47402. It is clear from the above description of oakum that there is a complete absence of the term "twist" as applied to the product. The mere fact that the Summary of Tariff Information, 1948, indicates the utilization of twist, is not controlling herein, unless it is established that the involved merchandise was not in existence on and prior to June 17, 1930, the date of the enactment of the tariff act, or there has been a change in meaning of the term "oakum." The latter in my opinion would require proof of commercial designation.

It is not contended that the type of merchandise covered by these protests was not in existence prior to the enactment of the 1930 act. This fact is clearly established in the case of *C. J. Hendry & Co.* v. *United States*, 60 Treas. Dec. 1311, Abstract 17530, which included, among other items, one known as rope oakum.

It is contended by plaintiff herein that the jute packing is also ordered by at least 5 percent of the trade as rope oakum. I would have considerable reservation in holding that the designation by 5 percent of the trade would establish the common meaning of the term.

In addition, it would appear that the jute packing involved herein is at best more than oakum. I do not dispute that for all intents and purposes the uses of the two items are the same. However, it is established that the production of jute packing requires additional refinements, such as the twist and the combination of from 7 to 12 rovings. In addition, the packaging of the finished product is different.

I am of the opinion that oakum, as used in the Tariff Act of 1930, *supra*, is a state of a product, namely, loose fibers; consequently, the use is not a determinative factor. In order for plaintiff to prevail, it must establish a commercial designation of the term "oakum" which would indicate that jute packing is definitely, uniformly, and generally known, bought, and sold throughout the United States as oakum. See *Nylos Trading Company* v. *United States*, 37 C.C.P.A. (Customs) 71, C.A.D. 422.

Not only has plaintiff failed to establish this; the record, on the contrary, establishes that delivery of jute packing is not good delivery for oakum.

I would, therefore, overrule the protest.